of America, Mayor of Brandao versus Attorney General of United States of America, Ms. Hunt. Good morning, Your Honors. May I approach you? I'm sorry? May I approach you? Thanks for the meeting. As the courts knows, this is an issue regarding Mr. Brandao's derivative citizenship through his mother under the Immigration Naturalization Act, 321. Your voice is very soft. Perhaps it would help me to hear if you pull the microphone down a little closer to you. I'm a little hard of hearing. So am I. How is that sound? Try it again. Is that better? Better. I'll try to keep my voice up. As I said, this is an issue of derivative citizenship. And as the courts know, we have a conflict here in some of the circuits. They are deeming countries' own laws determining paternity and legitimation in a very different way than we are here in the United States interpreting our laws through the Bureau. I'm sorry, the Board of Immigration Appeals. I assume many, many years ago, back before 1976, there were significant legal consequences to children who were born out of wedlock and were illegitimate. Consequences perhaps involving property, involving inheritance and things like that. Apparently significant discrimination. So Cape Verde sought to eliminate that discrimination. And they passed a law that said you cannot discriminate against children born out of wedlock. Now, Brandau, the petitioner here, was born after the passage of that law. So he was actually born, if we can say it this way, legitimate. Now, if that's the case, if he was born legitimate because of Cape Verde law, how do you get derivative citizenship under Section 321? He was born out of wedlock. And under the laws, the affiliation laws in that country, unless he is acknowledged informally or formally by his natural father,  Well, he may be a child born out of wedlock, however you want to consider that term. But he was born legitimate for purposes of Section 321. We would take issue with that most respectfully, Your Honor. We don't believe that that's the case. We believe that he... But what's the purpose, what was the purpose of Virginia's law 8476? The Cape Verdean... That's in Virginia. You may have one of those too. The purpose of that was singular in that it intended to eliminate, as the Court has referenced, all of the past discriminations, not only in inheritance, but in education, in Social Security. Children born out of wedlock were not able to receive any of those benefits. So it eliminated all discrimination against children born out of wedlock. It did, but our position is that it did not also deem Mr. Brandau's father to be his paternal natural father. The focus is not on the father. The focus is on the child. They did not legitimate Brandau, Gelson Brandau, for purposes of Cape Verdean law. No, the only way that Gelson Brandau could be legitimated would be through the acknowledgement of his father. I'll stick with you just for one or two more questions. Is this because of the law that preceded the 8476 law? That has always been the law in Cape Verde. Doesn't 8476 abolish all inconsistent laws? No. As a matter of fact, if I could refer the Court to appendix on page 47, there are very specific things in that law that accept the prior laws. They say, we're going to abolish the discriminations, but we're not taking away the laws determining paternity. I thought 8476 specifically repealed all laws that were inconsistent with that statute. I think that would be at article 22, which is on page 50. All previously enacted legislation containing provisions contrary to those of the present decree law, and they're talking about 8674. Could you finish the sentence, please? All previously enacted legislation containing provisions contrary to those of the present law is hereby repealed. But if you look at what's right above that, the entirety of chapter 2 repeats and reiterates that acknowledgement is the only way to determine paternity. It doesn't fall within any of the buzzwords that we know. It could have said, we abolish the law saying fathers have to acknowledge for a child. It's kind of odd, don't you think, that a country would enact a statute like this, legitimizing all children born out of wedlock but still leave it, gives sort of like a peremptory to the father? Most respectfully, I don't think so. I think they're saying that this new law is just for purposes of legal access, financial access, educational access. What if the father's not around? What if the father is dead? What if the father has left the country? That's the issue here, is that there is no way in that case for the child to determine and say, I was born out of wedlock and here's the proof. It's kind of like Cape Verde did something to rectify an injustice, but then left it still open to the father to make that final decision. Right, I don't think that they're saying here, as was interpreted, or Sarah has interpreted several of the other cases, that it's not all inclusive. These new legitimation laws in all of these countries are not all inclusive. I'm going to shift you away from Cape Verde to the INA, to the law which we're looking at here. And 1432A3, the second part of A3, is the subparagraph that we're really dealing with here and looking at. What's the purpose behind granting this form of derivative citizenship to somebody like Brandau? Because I think the answer to that question determines whether paternity is the key or legitimization is the key. I think the conflict is people have used those words interchangeably and that's unfortunate. They should be completely separate. I agree with that. And in the matter of race, the Bureau and the Board looks at the definition of legitimation and says, initially it was under the common traditional definition. A legitimated child was one whose father had stepped up and said, that's my son. But then it changed and it said, under 101, we're only going to deem a child legitimated if there's a law in their country that, for all purposes, makes them legal, including that father. But that could raise some issues of fraud. For our law, the Supreme Court said in our law that those distinctions go both ways, whether as an acknowledged child under the laws of the country or as a legitimated child under the new laws, makes a great deal of difference. And the court said there, the judiciary isn't going to get to decide this. This is done by the political branches of government. Can you distinguish in the matter of Cardozo a case in which the Board of Immigration Appeals addressed an issue quite similar to the one in this case in the context of an application for preferential immigration classification? And there, the board concluded that a 17-year-old had, in fact, been legitimated for purposes of that provision. Why would we treat this case different from that case? Well, for one, the intent of the legitimation laws are very different. We're talking about the same law. We are talking about the same law, but in terms of visa preference. The intent of the immigration statute is for the child, whereas when it's derivative citizenship, we're talking about the mother and the father and the authority they have in their parental rights. Does it make more sense to apply these laws consistently rather than apply them given different purposes? Absolutely. And you know, the Third Circuit has done that to me. You agree with me that the law should be applied consistently? Absolutely. I thought you were going to say absolutely not. No, absolutely it should be applied consistently. Well, if we apply them consistently, then you would lose in this case, because we would have to apply the same rationale that the court did in Carnazo. Well, I don't think so. I mean, the courts have reversed several of the prior cases where they first found for the agency and then found for the child, based on certainly in Grossero where the court itself, the district court, went and got the Library of Congress to investigate, research, evaluate this in a much more sophisticated way than even Chevron requires. This court in Parks, in Bagot, in several cases has taken the initiative to do not only the research. In Parks, they did very serious research. In Bagot, they also did very serious research. In fact, they even investigated state domestic relations laws in looking at not only other circuits. That kind of evaluation seems to me to be much more sophisticated and much more important. In those cases where district courts have actually delved into the question of whether or not that country intended to eliminate any paternity issues and just give everybody carte blanche. If we find that the BIA should be accorded a Chevron deference, do you lose? No. No, because I would argue that the decree law is completely unambiguous. And if the court were to find that it were ambiguous, I would argue that under the second prong, it's an unreasonable decision because that decision totally flies in the face of the intent of the statute. It forecloses any child from achieving citizenship, derivative citizenship, into the United States. If I understand you correctly, your view is that under Cape Verde law, a father still has veto power over the concept of legitimation. Yes, unfortunately that's true. Thank you very much. Thank you. Ms. Mercier, did I say that correctly? Yes, Your Honor. Pardon me. May it please the Court, Lisa S. Mercier of the Office of Immigration and Litigation for the respondent. There are two sources of citizenship and two only, birth and naturalization. Citizenship at birth can be acquired by being born in the United States. If a person is not born in the United States, he or she can acquire citizenship at birth only as provided by Congress. The relevant statute in this case, former IMA Section 321A of the Immigration and Nationality Act, generally provided for derivative citizenship to be obtained upon the naturalization of both parents, but expressly limited derivative citizenship in circumstances where only one parent was being naturalized. Relevant to this case, therefore, the statute dictates that derivative citizenship upon the naturalization of the mother, if the child is born out of wedlock, should only occur if the paternity of the child has not been established by the generation. Can we talk about the purpose of the law for a minute? I understand that the purpose of Section 321 is to keep families together, and that's why derivative citizenship is made possible for children like Gelson Brando. And if that's the purpose, does it make sense to send him back to Cape Verde just because he is now a legitimate child? It doesn't keep families together, does it? Well, Your Honor, the derivative citizenship's legislative history is extraordinarily complicated in many ways. It began with citizenship for children who were born of alien parents or who were born of United States citizen parents but outside the country. It was extraordinarily restrictive. It was originally limited to fathers and only to fathers, and then it evolved in some ways so that it became a little bit too liberal. And at some point, Congress made it more difficult for aliens to obtain United States citizenships because of concerns about the burden on the United States government and its agencies in protecting persons who are only nominal citizens. You're going to talk about Section 321, aren't you? Yes, I am. I'm sorry. I'll get to the point in a second. But I'm just going through that. So when we got to the point of derivative citizenship as it was enacted in Section 321A1, Congress did initially intend a general rule to provide automatic citizenship to children born of non-alien parents. However, at the same time, it realized that it did not want to affect the rights of the non-naturalizing parent. So initially, insisting on both being naturalized was deemed necessary, not only to prevent alien children whose real interests were not located in America from being naturalized but also to protect an unnaturalized parent from losing custody or other parental rights. However, realizing that not everybody would have both naturalized parents if both parents were naturalized, they created exceptions to this rule. But exceptions were very limited. And in this case, Section 321A3 specifically limits derivative citizenship in the case of an unwed mother. In the circumstance... I was just thinking of a practical, maybe too practical a consequence. Given the purpose of the law, which is to keep families together, and that's why derivative citizenship is made possible. And we're doing just the opposite here. We're breaking apart the family. This kid actually has been in this country for a good 14 years or so, and now he's going back. Why does that make sense? Well, Your Honor... Maybe it makes sense because I was convicted of a crime, but I'm not sure that goes to my question. I was trying to be more articulate about this. The purpose may be to allow children to join their parents if they're naturalizing. These exceptions, specifically this one, is to provide for the circumstance when the father may still have rights to the child. In this particular circumstance, you might have a father who was not present in the child's life. However, the general purpose of requiring the legitimation, the establishment of paternity by legitimation, was to preserve the parental rights of the non-naturalizing parent. It was to keep together the rights and the concerns. I think that answer... Thank you, and I'm proud of you for your answer. I think that that answer cuts against your argument and your position because you're talking about the fact that A3 of Section 321 is the way it is to protect the rights of a non-naturalized parent. But here, all you have is a situation where, at best, and I don't see it argued anywhere, this is material at best, the father's name appeared on the birth certificate, but there's no indication of acknowledgment of paternity. So I think it could be argued here if the purpose is, as you said it is, to protect the rights of the non-naturalized parent. There's no non-naturalized parent who has stepped up and said, Petitioner is my son. While that is true in this particular case, I'm looking at... The government's looking at the plain language of the statute. The plain language provides for that protection. In this particular case, it's not an ideal result. However... Let me stop you there. Do you think that the plain language is unambiguous? Yes. Yeah. The plain language is unambiguous here requiring legitimation. That was the argument in the government's brief. So you think it's... All right. So you don't think that there's another reasonable reading of that statute that requires acknowledgment of paternity? No. As the government argued in its brief, acknowledgment is provided for in Cape Verde law. Paternity is actually... A strong paternity has to be established. As the Second Circuit said in the case of Lau, a paternity proceeding is intended to establish the identity of the father while legitimation while pursuant to the statute is universal, establishes the legal status of the child. And it... So that... It rejected that reading the Chinese law's language where the paternity of a child born out of wedlock is legally established as it requires that paternity be established by means of another legal procedure as a prerequisite to a child's legitimacy where the legitimacy is a legal construct and paternity as a biological fact. And the phrase legally... The phrase established did not exclude methods of establishment other than court orders. So here paternity has been established. Paternity has been acknowledged. The paternity has been established by the birth certificate. Where is it acknowledged? On the birth certificate. On the birth certificate. You say that's enough. Yes. If this... Let me ask you this question then. If that name had not been on the birth certificate, would your position be different here? Well, Cape Verde's law... In this particular case, Cape Verde, the decree itself, provides for the name being on the birth certificate. In other words, the mother says, I don't know who the father is. They have affiliation proceedings provided for in Article 10. However, they also provide in Article 9 for exactly what happened here. I'm referring to the decree law right now. Well, I think the question is, does legitimation depend on paternal acknowledgement of the child? Well, paternity... That's certainly the point I think that Ms. Hunt is taking. Well, as the government rooted in its faith, the decree law actually has provisions to provide for the establishment of paternity. It has it in Article 5, in Article 6, Article 7, Article 9. And here it was provided for. Does Cape Verde law depend on paternity being established? There are two different questions here. There's the establishment of paternity... I thought the law just said, we are now hereafter going to legitimize all children born out of wedlock, period. Yes. Now, does that law depend on paternity being established? On the face of it, I think not, but maybe you can tell me otherwise. Well, if you honestly look at the decree law itself... It's an anti-discrimination law. Yes. And it provides for the establishment... Why would the law depend on paternity if it's an anti-discrimination law? It provides for both the rights and duties of the parents and the children face-to-face with each other. I thought Judge Fisher had a very good point. What if the mother doesn't know who the father is? How would you determine paternity? Well, Article 10 of the decree actually provides for cases where the father or mother's name is withheld or in which a parent's maternity or paternity is denied or challenged. So Cape Verde's law itself provides for the establishment of paternity as well as legitimation. And one of the ways in which it provides for the establishment of paternity is exactly what happened in this particular case under Article 9, that a child born out of wedlock must be registered and acknowledged either jointly or separately by both the parents. In cases where only the mother appears to register the birth of a given child, she shall record the name of the child's father according to the current legal requirements, including recording it on the birth certificate. Can I take you to a different point since your time is up? On the deference that we have to his, the Board of Immigration's appeals, review of Cape Verde law, do we defer to the Board of Immigration appeals as to what Cape Verde law means? Well, as an initial matter, the court wouldn't need to reach the shutdown issue there as the meaning of the statute is playing on its own terms. Further, like this court's decision, the Board... Well, I know it's playing on its own terms. We've been debating about it the past ten minutes. But you say that it is plain and we don't have to worry about Chevron deference? If the court decided that it was not playing on its own terms, the government's position is that yes, the court owes Chevron deference to the Board's interpretation in this case. It has defined legitimation. It has consistently defined legitimation throughout its cases. And as well, it has consistently applied this particular legitimation by operation of law, which is what occurred in this case consistently throughout its cases. You don't think that we can read foreign law just as well as the Board of Immigration appeals can read foreign law? While the court looks to foreign law, the court does review... You defer if there's a certain level of competence and expertise in the agency in what it does. But is there anything special that requires special or competence different from the judiciary so that we have to defer to the BIA? In this circumstance, yes. Because both the Constitution and Congress have given the Attorney General and through the Board the ability to execute the immigration laws, including the naturalization laws. And here, what is under question is the definition of legitimation under the naturalization laws. As such, the court should owe deference to the Board in this particular circumstance. As a holder of much of the Attorney General's delegated power, the Board should be accorded the Chevron deference. To return to the question of Judge Fischer of how in this particular case the concept of legitimation as applied perhaps seems unfair or unjust because of the way that it's being applied in this particular case and under Cape Verde's foreign law, as the Respondent pointed out in its brief and as the Seventh Circuit pointed out in Wedderburn v. INS, when some foreign nations made it possible to legitimate a child without marriage or indeed abolish the distinction between legitimate and illegitimate children, this created the possibility that the legitimate child could not use this particular clause, section 321.83. The Bishop may see this as a gap, and it may seem as if in application it is a gap in the particular statute, but it's not the proper function of interpretation as opposed to amendment to ensure that every development in foreign law has a corresponding benefit under U.S. law. Thank you. Thank you very much. Thank you very much. Ms. Hunt? Your Honor, just for a moment, I would like to ask you to review the Decree Act. There are four different places where Petitioner would argue it makes very clear that it is keeping the Acknowledgement Law in place. That's it. You're arguing similar to the Hines and Roe cases that you're saying. It is, but their little language is very different. This one is much more precise. In 5, in Article 5, where it says, Paternity, on the other hand, is established through the express declaration to such effect by the father. Now, this is in the decree law without prejudice to the provisions of the present decree law and or other laws currently in force. That suggests to me that they're saying we're going to have this new law, but we're not losing the old one. We need the old one. I understand, Ms. Hunt, that Section 321 has been amended. Is that correct? In other words, it's a little easier nowadays to get derivative citizenship. You're not familiar with that? I'm not aware of that, if it is the case. Article 7 says, under other circumstances than those referred to in the preceding article, paternity is presumed when a father voluntarily admits paternity in writing. Again, it continues to repeat. If it were trying to remove this piece and take over, it could have used the words, we're going to repeal. It seems to me that you have two inconsistent laws then. You have one law that says we're going to eliminate all discrimination for children born out of wedlock. Then you have another one that says, however, we're going to get the father veto power on adjudication. Most respectfully, I'm not sure that I think that's inconsistent. I don't think it says anywhere in here, we're putting out decree law for all purposes. Its reference, its intent, is to focus on financial, educational, social issues. I believe that that's what it is. As for Cardoza, the difference in Cardoza and here in Brando is, there are three or four points where there is specific language accepting the prior acknowledgement child laws. In Cardoza, the BIA went directly with a law student's interpretation of Article 2 and Article 22, saying, whoops, it looks like those are fundamentally looking for change in K-30. We think that change is dot, dot, dot. That was a good law student. That's the difference. That was a good law student. Yeah, really. Thank you very much. Thank you kindly. Thank you both. We'll take the case and revise it.